**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5232-18T3

CATHERINE SCOTT,

    Plaintiff-Respondent,

v.

EARNEST SCOTT,

    Defendant-Appellant.

_____

Submitted November 12, 2020 – Decided  December 9, 2020

Before Judges Geiger and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FM-01-0412-14.

King & King, LLC, attorneys for appellant (Sharon A. King, on the brief).

Fuhrman & Edelman, attorneys for respondent (Ronald B. Edelman, on the brief).

PER CURIAM

In this post-judgment matrimonial matter, defendant Earnest J. Scott appeals from a June 21, 2019 Family Part order that: (1) denied his motion to vacate the parties' property settlement agreement (PSA); (2) denied his motion to reduce or suspend his alimony obligation; and (3) granted plaintiff Catherine J. Scott's cross-motion to enter judgment against defendant to enforce his arrears. Defendant also appeals from a July 16, 2019 Family Part order that: (1) granted plaintiff's motion to satisfy the judgment entered against defendant through a Qualified Domestic Relations Order (QDRO) imposed against defendant's annuity fund and pension fund; (2) awarded plaintiff attorney's fees and costs in the amount of $2252.50, enforceable through a QDRO against defendant's annuity fund and pension fund. We affirm.

We derive the following pertinent facts from the record. The parties were married on June 13, 1997 and had two children. Plaintiff filed a complaint for divorce from bed and board on November 13, 2013. Prior to filing the complaint, plaintiff's counsel sent a proposed PSA to defendant in an attempt to resolve the matter. Defendant requested a meeting to discuss the proposed PSA.

The proposed PSA included a $325 per week permanent alimony award and $25,000 for plaintiff's share of the equity in the marital home. Defendant proposed reducing the alimony to term alimony of $300 per week for fifteen

years and reducing plaintiff's share of the equity in the marital home to $20,000. Plaintiff advised she would agree to those changes provided the term alimony would be non-modifiable.

Plaintiff's counsel sent the modified proposed PSA to defendant on November 21, 2013. No further modifications were made to the proposed PSA. Almost three months later, the parties executed the PSA on February 14, 2014. Although defendant remained unrepresented by counsel during the negotiations, he hired an attorney to review the final version of the PSA before signing it.

Under the terms of the PSA, defendant agreed that plaintiff would receive: (a) alimony in the sum of $300 per week for 15 years; (b) fifty percent of defendant's pension plan; (c) sixty-two percent of defendant's annuity fund purportedly valued at $230,036 but actually valued at approximately $300,000 at the time of rollover; and (d) medical insurance coverage under defendant's policy.

In addition, plaintiff agreed to waive her interest in the marital home. The parties "agree[d] and acknowledge[d] that the value of the property and attached land [was] approximately $168,000.00" and that the aggregate balance of the first and second mortgage was approximately $118,000. The PSA confirmed that plaintiff agreed to convey all right, title, claim, or interest in the property in

3

exchange for distribution of "an additional twelve (12%) percent of [defendant's] Pointers Local 13 Annuity."

Notably, the PSA reveals that, prior to the settlement, the parties heavily disputed defendant's "obligation to pay alimony both as to the amount and duration." However, the PSA explains that "[i]n consideration of the terms and provisions of the agreement, [plaintiff] has agreed to accept and [defendant] has agreed to pay irrevocable and non-modifiable limited duration alimony." The PSA specifically provided that, "[not]withstanding any language contained in Lepis v. Lepis[1] or Crews v. Crews,[2] the alimony paid should be non-modifiable and that this provision is irrevocable even if" defendant experienced "dramatic and substantial changes in income of whatever nature, scope or duration." The PSA further provided that the alimony is non-modifiable even in the event of "[a]ny illness or condition developed by the [plaintiff] or [defendant] at any time." The PSA then reiterates that:

> G. Specifically, both [plaintiff] and [defendant] waive any rights they may have under the Lepis and/or Crews decision to later argue that subsequent changes or circumstances render the alimony waiver at the end of the term or the alimony non-modifiability during the term either unfair or inequitable. Each party

---

[1] Lepis v. Lepis, 83 N.J. 139 (1980).

[2] Crews v. Crews, 164 N.J. 11 (2000).

acknowledges having been advised by their counsel of their Lepis and/or Crews changed circumstance standard and further acknowledge that they have been supplied with a copy of the decision and fully understand the rights they are waiving. [Defendant] shall not have the right to modify his alimony obligation based on further beneficial financial changes on the part of [plaintiff] including but not limited to her earned or unearned income.

H. It is [the] specific agreement of the parties to introduce concepts of collateral estoppel into this agreement to prevent [plaintiff] and [defendant from] seeking modification of the alimony during or at the end of the term without which [defendant] and [plaintiff] would not have agreed to obligate themselves to make the economic adjustments made hereunder.

Defendant did not file an answer to the complaint. Default was entered against him. On March 11, 2014, a final judgment of divorce from bed and board was entered on the ground of irreconcilable differences. The judgment incorporated the terms of the PSA. An August 4, 2014 QDRO that provided for distribution of fifty percent of defendant's pension fund to plaintiff was entered by consent.

In September 2017, defendant moved to convert the judgment to a final judgment of divorce (FJOD). On November 17, 2017, the trial court granted the motion. Defendant's request for an award of counsel fees was denied.

In April 2018, defendant moved to reduce alimony, claiming he suffered a substantial reduction in income as a result of injuries sustained in a motor vehicle accident on April 10, 2018. Defendant certified that he was unable to work and receiving treatment at Cooper University Hospital Trauma Center. Defendant's certification did not set forth the nature or extent of his injuries. Nor did he provide competent medical evidence regarding any resulting disability from employment. Plaintiff opposed the motion and cross-moved for an award of counsel and costs totaling $1500.

On June 14, 2018, the court issued an order and written statement of reasons denying defendant's motion to reduce alimony and plaintiff's cross-motion for counsel fees. The court noted that defendant[3] "failed to provide a current case information statement" (CIS), in violation of Rule 5:5-4(a). It further noted that defendant failed to provide "documentation regarding his claim that he is now disabled and unable to pay his alimony obligation." The court concluded that defendant did not make a prima facie showing of changed circumstances. As to his allegation that he is now earning significantly less income due to disability resulting from the accident, the court noted that

---

[3] At several points in its statement of reasons, the trial court mistakenly referred to defendant as plaintiff.

6

defendant "did not provide a police report, an accident report, an injury diagnosis, a doctor's report, nor any proofs concerning his disability." As a result of these findings, the court did not reach the issue of non-modifiability of defendant's alimony obligation. Defendant did not appeal from that ruling.

As to plaintiff's counsel fee application, the court found "[d]efendant did not exercise bad faith" in moving for an alimony reduction. The court also found "that both parties [were] able to pay their own counsel fees" but noted defendant was unrepresented. The court noted that defendant earned $61,000 in 2017. The court declined to award counsel fees to plaintiff as a sanction against defendant.

On April 4, 2019, plaintiff moved to: (1) enter judgment against defendant for alimony arrears in the sum of $16,399; (2) an order allowing for payment of the judgment and future alimony payments from defendant's annuity and pension plans; and (3) an award of counsel fees and costs in the sum of $1355. The attorney's fees were billed at the rate of $290 per hour. Defendant cross-moved to reduce and suspend alimony.

Plaintiff's supporting certification noted that the PSA obligated defendant to pay her term alimony of $300 per week for fifteen years. Plaintiff averred that defendant owed her alimony arrears of $16,399 as of March 25, 2019.

Defendant's certification confirmed that he met with an attorney to review the proposed PSA. The attorney told defendant "that she thought the agreement was fair and suggested that [he] sign it." Defendant noted, however, that the attorney did not review any CISs or otherwise inquire about either party's financial circumstances or review the proposed equitable distribution. Defendant certified that the attorney he consulted "did not explain my rights under Lepis v. Lepis, or that the agreement contained an anti-Lepis clause, or the significance of this clause." Defendant certified that despite language in the PSA to the contrary, he was not advised of the Lepis or Crews decisions and "did not understand that [he] was waiving [his] rights under those decisions." Defendant stated that he stopped attending high school after the tenth grade and did not obtain a GED. He contended he did not understand his rights under Lepis or knowingly waive them. He claimed the PSA was not the product of negotiation.

Defendant claimed the PSA "was one-sided in favor of plaintiff." Defendant noted that the attorney he consulted to review the proposed PSA was not involved in any negotiations. He further noted that he did not attend the final hearing for entry of the judgment from bed and board.

As to his reduced income level, defendant stated he was earning approximately $70,000 as a brick layer when the PSA was executed. In February 2018, he filed a claim for unemployment benefits because he "was between projects." In April 2018, he "was involved in a serious accident and [had] not worked since." Although his unemployment benefits were extended after the accident, the $14,586 in maximum benefits was exhausted. Sixty percent of the benefits were allocated to plaintiff towards alimony. Defendant also received $400 per week in disability benefits under his auto insurance policy. Of that amount, defendant paid $260 per week to plaintiff, leaving him only $140 per week.

Defendant asserted that his home was in foreclosure, but a mortgage modification was conditionally approved. He claimed he was unable to afford internet service or cable television, wore clothing donated by his church, and received food from a local food pantry.

The court issued a June 21, 2019 order granting plaintiff's motion to enter judgment against defendant for the alimony arrears. It denied defendant's cross-motion to reduce or suspend his alimony obligation and to vacate the PSA. The court reserved on the issues of enforcing the judgment against defendant's

A-5232-18T3

annuity or pension plans and plaintiff's counsel fee request. It afforded defendant an opportunity to submit an alternative way to satisfy the judgment.

The court defendant's request to vacate the agreement because defendant failed to produce sufficient evidence that he did not understand the terms of the PSA or that he could not, with reasonable diligence, have understood them. The court found that defendant had an attorney review the proposed PSA. It further found that the proposed PSA "was negotiated and changed."

The court found the agreement was neither "egregiously one-sided [n]or unfair based on the circumstances." It further found that defendant entered into the PSA freely and voluntarily.

Next, the court addressed the anti-Lepis clause. The court found it "ha[d] no choice . . . but to enforce the agreement that the parties" made. It noted that "parties can incorporate an anti-Lepis clause into a property settlement agreement but must do so with full knowledge of all present and reasonably for[e]seeable future circumstances."

The court found that the PSA specifically detailed such circumstances, one of which defendant based his application on. It noted the anti-Lepis clause was almost two pages long and listed several events that would not allow for alimony modification.

Relying on <u>Morris v. Morris</u>, 263 N.J. Super. 237 (App. Div. 1993), the court found that the PSA contained a clear provision prohibiting alimony modifications despite enumerated changed circumstances. The court further found "there was consideration given" for the anti-<u>Lepis</u> clause. The court held defendant responsible for learning the impact of the anti-<u>Lepis</u> clause before signing the PSA and that plaintiff's counsel had no duty to explain the meaning of the clause.

Lastly, the court explained that <u>Morris</u> allows for alimony modification in extreme cases; however, the court found that defendant failed to provide any evidence of an extreme medical condition that rendered the agreement inequitable. The court noted that none of the reports submitted by defendant "indicated by a reasonable degree of medical certainty that [defendant was] unable to perform the duties that he performed."

The court granted plaintiff's application to enforce the alimony arrears for the same reasons it denied defendant's application to reduce, suspend, or vacate the alimony provision. As to plaintiff's request for the judgment to be satisfied through defendant's annuity plan or pension, the court reserved to conduct further research and to allow the parties time to brief the issue.

On July 16, 2019, the court granted plaintiff's request to enforce the judgment through a QDRO directed at defendant's annuity and pension fund plans. In an accompanying memorandum of decision, the court relied on our decision in Orlowski v. Orlowski, 459 N.J. Super. 95 (App. Div. 2019). The court reiterated that defendant's application was not supported by any financial information as required by court rules. Since the FJOD required defendant to pay plaintiff $300 per week in alimony and defendant had failed to pay alimony for approximately fifty-eight weeks, the court found that defendant owed plaintiff $17,600.93 in alimony. The court rejected defendant's alternative payment method of satisfying the arrears at the rate of $100 per week. The court concluded that permitting plaintiff to invade defendant's retirement accounts by way of QDRO would be the only way to satisfy the alimony arrears given defendant's lack of income and assets.

In addition, the court awarded plaintiff counsel fees and costs of $2252.50, also to be paid by way of QDRO imposed on defendant's retirement accounts. As to the reasonableness of the attorney's fees, the court reviewed the certification submitted by plaintiff's counsel, and it found that "the hourly rate charged by plaintiff's attorney [was] reasonable and commensurate with attorneys [of] similar experience in Atlantic County, N.J." The court found the

4.25 hours expended by counsel was "extremely reasonable," as was the resulting fee request of $2102.50 and $50 filing fee. The court further found that "[d]efendant's income ability [was] sufficient to pay counsel fees. Plaintiff should not be burdened with counsel fees spent for enforcement purposes." It concluded that the counsel fees incurred "for the successful enforcement of an alimony obligation" should be awarded and "paid from defendant's portion of his qualified retirement plans." This appeal followed.

Defendant raises the following points for our consideration:

POINT I.

THE PARTIES' PROPERTY SETTLEMENT AGREEMENT IS UNENFORCEABLE AS APPELLANT DID NOT UNDERSTAND THE ANTI-LEPIS PROVISION OF THE AGREEMENT, DID NOT KNOWINGLY WAIVE HIS RIGHT TO MODIFY ALIMONY, AND AS THE PARTIES DID NOT CONTEMPLATE THE UNFOR[E]SEEABLE AND EXTREME CIRCUMSTANCES OF AN AUTOMOBILE ACCIDENT THAT WOULD RENDER THE DEFENDANT INCAPABLE OF WORKING.

POINT II.

DEFENDANT IS ENTITLED TO A REDUCTION OR SUSPENSION OF ALIMONY IN LIGHT OF THE CHANGED CIRCUMSTANCES OF BOTH PARTIES.

POINT III.

THE TRIAL COURT ERRED IN GRANTING JUDGMENT TO SATISFY ALIMONY ARREARS IN FAVOR OF THE PLAINTIFF AND AGAINST THE DEFENDANT.

POINT IV.

THE TRIAL COURT ERRED IN AWARDING ATTORNEY'S FEES TO THE PLAINTIFF.

POINT V.

THE TRIAL COURT ERRED IN ORDERING THE SATISFACTION OF ALIMONY ARREARS AND ATTORNEY'S FEES VIA A QDRO.

Appellate review of Family Part orders is generally limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We afford considerable deference to the discretionary decisions of Family Part judges. Donnelly v. Donnelly, 405 N.J. Super. 117, 127 (App. Div. 2009) (citing Larbig v. Larbig, 384 N.J. Super. 17, 21 (App. Div. 2006)). The Appellate Division "accord[s] particular deference to the Family Part because of its 'special jurisdiction and expertise' in family matters." Harte v. Hand, 433 N.J. Super. 457, 461 (App. Div. 2013) (quoting Cesare, 154 N.J. at 413).

Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-

14

12 (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)). The reviewing court will not disturb the factual findings and legal conclusions of the trial court unless convinced they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (quoting Elrom v. Elrom, 439 N.J. Super. 424, 433 (App. Div. 2015)). Challenges to legal conclusions, as well as a trial court's interpretation of the law, are subject to de novo review. Id. at 565.

We affirm the trial court's orders substantially for the reasons expressed in its June 21, 2019 oral decision and July 16, 2019 memorandum of decision. We add the following comments.

Based on our careful review of the record, we discern no abuse of discretion warranting our intervention. Substantial, credible evidence in the record supports the trial court's decisions, and we are satisfied there was no denial of justice under the law.

Defendant argues that the PSA is unenforceable because he did not understand the PSA given his limited education level. He claims that "[t]he trial court's findings were not supported by adequate, substantial, credible evidence" because the court reached its conclusion "[w]ithout taking testimony from the

defendant," without questioning defendant about his comprehension ability, and without holding "a plenary hearing . . . to ascertain facts relevant to the defendant's claims." Defendant further asserts that he was "not meaningfully represented throughout the PSA negotiations and divorce process." We are unpersuaded.

Consistent with New Jersey's "'strong public policy favoring stability of arrangements' in matrimonial matters," courts will not "unnecessarily or lightly disturb" a PSA where matters in dispute in a post-judgment matrimonial motion are addressed in a fair and equitable agreement. Quinn v. Quinn, 225 N.J. 34, 44 (2016) (quoting Konzelman v. Konzelman, 158 N.J. 185, 193-94 (1999)) see also Dolce v. Dolce, 383 N.J. Super. 11, 20 (App. Div. 2006) (explaining that PSAs are entitled to "considerable weight with respect to their validity and enforceability" when they are fair and just).

Nevertheless, courts have the authority to modify a PSA agreement because of unconscionability, misrepresentation, or fraud. Addesa v. Addesa, 392 N.J. Super. 58, 66 (App. Div. 2007). An application to modify a property settlement agreement may be made pursuant to Rule 4:50-1(f). Connor v. Connor, 254 N.J. Super. 591, 601 (App. Div. 1992). To meet the stringent requirements of Rule 4:50-1(f), the moving party must make a "showing of

16

fraud, misconduct or mistake in the negotiations or a showing of fundamental inequity or unfairness in the agreement." Ibid. Thus, the party challenging the agreement bears the burden of demonstrating that the agreement is unfair and inequitable. Guglielmo v. Guglielmo, 253 N.J. Super. 531, 541 (App. Div. 1992).

We first note that the language of the anti-Lepis clause was clear and unambiguous. It plainly set forth that subsequent loss of income or change in medical condition was not a basis to modify the term alimony. Its meaning was not shrouded in obscure legal terminology. It was easily understandable by a lay person. The court had no obligation, in this present case, to reform the PSA when the intent of the parties was clear. Quinn, 225 N.J. at 45.

Defendant sought, in part, to vacate the PSA. To that extent, his application is untimely. A moving party seeking to vacate a PSA incorporated in a judgment must file their motion "within a reasonable time, and for the reasons (a), (b) and (c) of [Rule] 4:50-1 not more than one year after the judgment, order or proceeding was entered or taken." R. 4:50-2. Here, the PSA was incorporated into the final judgment from bed and board on March 11, 2014. Defendant filed his cross-motion on June 3, 2019, more than five years later. To the extent that defendant bases his motion on "mistake, inadvertence, surprise,

or excusable neglect" under Rule 4:50-1(a), his motion is clearly time-barred. Ibid. To the extent defendant claims the PSA "is no longer equitable" or "for any other reason justifying relief," Rule 4:50-1, his motion is still time-barred as it was not filed "within a reasonable time," Rule 4:50-2. For this additional reason, defendant's application to vacate the alimony provision of the PSA was properly denied.

Moreover, defendant did not make out a prima facie case that the alimony provision was unfair or inequitable when agreed upon. Nor did he establish that the PSA was "achieved through coercion, deception, fraud, undue pressure, or unseemly conduct." Peskin v. Peskin, 271 N.J. Super. 261, 276 (App. Div. 1994). On the contrary, plaintiff's original proposal for $325 per week permanent alimony award was reduced through negotiation to term alimony of $300 per week for fifteen years. And, as noted by the trial court, defendant received consideration for the term alimony provision.

Although defendant only completed the tenth grade, he has he shown that he was incapable of reasonable diligence by hiring counsel to represent him in the negotiation of the PSA or the divorce action in general.

Defendant argues that he is entitled to a reduction or suspension of alimony because of the changed circumstances of both parties. Specifically,

defendant claims that at least three of the circumstances recognized under <u>Lepis</u> warrant modification in this case, such as a decrease in the supporting spouse's income, illness arising after the original judgment, and subsequent employment of the dependent spouse.

The decision to modify an alimony obligation "based upon a claim of changed circumstances rests within a Family Part judge's sound discretion." <u>Larbig</u>, 384 N.J. Super. at 21. An alimony determination will not be overturned on appeal absent an abuse of discretion. <u>Rolnick v. Rolnick</u>, 262 N.J. Super. 343, 360 (App. Div. 1993). "[E]very motion to modify an alimony obligation 'rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matters.'" <u>Donnelly</u>, 405 N.J. Super. at 127 (quoting <u>Larbig</u>, 384 N.J. Super. at 21).

Aside from the import of the anti-<u>Lepis</u> clause, the trial court correctly found that defendant's moving papers were deficient. Noticeably absent from defendant's submissions is any competent proof that he is permanently disabled from employment.[4] Indeed, his application does not even describe the nature

---

[4] Defendant submitted a series of letters by physicians indicating he was temporarily unable to return to work due to orthopedic or cardiac issues, none of those submissions indicated he was permanently disabled from employment.

and extent of his injuries sustained in the accident and their impact on his ability to work as a bricklayer or in other capacities.

Defendant did not demonstrate he is permanently disabled from employment. A temporary reduction in income is not a basis for reducing support. Innes v. Innes, 117 N.J. 496, 504 (1990) (citing Bonanno v. Bonanno, 4 N.J. 268, 275 (1950)). For this additional reason, defendant did not make out a prima facie case of changed circumstances.

We next address defendant's arguments that the trial court erred by entering a judgment and QDRO to enforce and satisfy defendant's alimony arrears. Defendant's argument that enforcing the alimony arrears through a judgment was improper is meritless. R. 2:11-3(e)(1)(E). Accordingly, we will focus on granting enforcement through a QDRO.

A QDRO is a domestic relations order that "creates or recognizes the existence of an alternative payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan." 29 U.S.C. § 1056(d)(3)(B); see also 26 U.S.C. § 414(p)(1). "Alternate payee" is defined as "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan

with respect to such participant." 29 U.S.C. § 1056(d)(3)(K); see also 26 U.S.C. § 414(p)(8).

In Orlowski, we held that a court may compel reimbursement of college tuition, expert witness fees, and counsel fees through a QDRO against the husband's annuity account, which was governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 to 1461, when the ex-spouse is the alternative payee of the QDRO. 459 N.J. Super. at 99.

Marital decrees that do not meet the statutory definition of a QDRO are preempted by ERISA. Id. at 105 (citing Ross v. Ross, 308 N.J. Super. 132, 150 (App. Div. 1998)). When a marital decree qualifies as a QDRO, however, "it is 'exempt from ERISA's preemption provision.'" Id. at 105 (quoting Hawxhurst v. Hawxhurst, 318 N.J. Super. 72, 84 n.1 (App. Div. 1998)). The QDRO ordered by the court met that requirement. With respect to attorney's fees, however, "QDROs should be utilized to enforce counsel . . . fee awards only when other assets sufficient to satisfy the awards either do not exist or have been made unavailable by the obligor." Id. at 108.

Here, the court afforded defendant ample opportunity to propose a reasonable method of satisfying his significant, longstanding alimony arrearages. While claiming he had no income, he proposed repayment at $100

21

per week. The court rejected that proposal. At that rate, it would take well more than three years to satisfy the arrears that totaled $17,600.93. Instead, the court reasonably concluded that permitting plaintiff to invade defendant's retirement accounts by way of QDRO would be the only way to satisfy the alimony arrears and counsel fees and costs given defendant's alleged lack of income or other assets. We discern no error or abuse of discretion.

Lastly, we address the counsel fees and costs awarded to plaintiff. Defendant argues that the trial court abused its discretion in awarding attorney's fees to the plaintiff because it misapplied the factors enumerated under Rule 5:3-5(c). Specifically, defendant claims that the court's finding that defendant had sufficient income to pay for attorney's fees was inconsistent with the record.

Counsel fee determinations rest within the trial judge's sound discretion. Williams v. Williams, 59 N.J. 229, 233 (1971). We will disturb a trial court's determination on counsel fees "only on the 'rarest occasion,' and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting Rendine v. Pantzer, 141 N.J. 292, 317 (1995)). An "abuse of discretion only arises on demonstration of 'manifest error or injustice,'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's decision is "made

without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"A lawyer's fee must be reasonable." Giarusso v. Giarusso, 455 N.J. Super. 42, 50 (App. Div. 2018) (quoting Rosenberg v. Rosenberg, 286 N.J. Super. 58, 69 (App. Div. 1995)). Determining the reasonableness of the fee involves determining the number of hours reasonably expended multiplied by a reasonable hourly rate. Id. at 51 (citing Rendine, 141 N.J. at 334-35). "Compiling raw totals of hours spent, however, does not complete the inquiry. It does not follow that the amount of time actually expended is the amount of time reasonably expended." Ibid. (quoting Rendine, 141 N.J. at 334-35).

Here, the court properly determined the reasonableness of the attorney's fee because it considered the number of hours reasonably expended multiplied by a reasonable hourly rate. Giarusso, 455 N.J. Super. at 50. The court noted that it reviewed the certification submitted by plaintiff's counsel and found that the number "of hours spent" was "extremely reasonable" and "the hourly rate charged by plaintiff's attorney [was] reasonable and commensurate with

A-5232-18T3

attorneys [of] similar experience in Atlantic County." The record fully supports those findings.

The court also correctly noted that the counsel fees were incurred to enforce the PSA incorporated into the judgment. See R. 5:3-5(c)(8). Rule 1:10-3 provides that a "court in its discretion may" award attorney's fees "to a party accorded relief under this rule" as one of the remedies for enforcement of litigant's rights. See also R. 5:3-5(c)(8). The rule "recognizes that as a matter of fundamental fairness, a party who willfully fails to comply with an order or judgment entitling his adversary to litigant's rights is properly chargeable with his adversary's enforcement expenses." Pressler & Verniero, Current N.J. Court Rules, cmt. 4.4.5 on R. 1:10-3 (2021). Awarding plaintiff modest counsel fees and costs to enforce the PSA was appropriate under the circumstances.

To the extent we have not specifically addressed any of defendant's remaining arguments, we conclude they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5232-18T3